# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

|  |  |
|---|---|
| WEEKS MARINE, INC., | Civil Action No. 11-3850 (ES) (CLW) |
| Plaintiff, | **OPINION** |
| v. | **FILED UNDER SEAL** |
| TDM AMERICA, LLC, |  |
| Defendant. |  |
| TDM AMERICA, LLC, and UTEX HOLDINGS, LLC, |  |
| Counterclaim-Plaintiffs, v. |  |
| WEEKS MARINE, INC., |  |
| Defendant. |  |
| TDM AMERICA, LLC, and UTEX HOLDINGS, LLC, | Civil Action No. 11-4338 (ES) (CLW) |
| Plaintiffs, v. |  |
| GLOUCESTER COUNTY IMPROVEMENT AUTHORITY, |  |
| Defendant. |  |

**SALAS, DISTRICT JUDGE**

This matter is before the Court by way of Weeks Marine, Inc.'s ("Weeks Marine") and

Gloucester County Improvement Authority's ("GCIA") motions to dismiss complaints in two

related actions pursuant to Fed. R. Civ. P. 12(b)(1).[1]  Oral argument was held on October 24, 2011.  Additionally, this matter is before the Court by way of GCIA's motion to stay proceedings in Civil Action No. 11-4338 pending a decision in Civil Action No. 11-3850.  The Court has considered the arguments of counsel and the submissions of the parties in support of and in opposition to the instant motion, and for the reasons set forth below, Defendants' motions— (D.E. 45 (11-3850)) and (D.E. 24 (11-4338))—are DENIED.

## I.      BACKGROUND

### A.      Parties and Procedure

The underlying issue in both cases is whether Weeks Marine and GCIA (collectively, "Defendants") have infringed U.S. Patent No. 6,293,731 ("the '731 patent" or " '731"), claiming a method for in-barge dredging.  TDM America, LLC ("TDM") is a Nevada limited liability company with a principal place of business in Addison, Texas, and is a wholly-owned subsidiary of UTEX Holdings, LLC ("UTEX"), a Delaware limited liability company with a principal place of business in Addison, Texas.  (*Answer and Amended Counterclaims*, D.E. 30 at 8, ¶¶ 2, 3 (11-3850)).  TDM and UTEX (collectively, "Plaintiffs") argue that TDM owns the '731 patent and that UTEX is TDM's exclusive licensee, and therefore both companies have standing to sue.

Weeks Marine is a New Jersey corporation with a principal place of business in Cranford, New Jersey, and is a leading marine construction and dredging corporation in the United States. (*Complaint*, D.E. 1 at 2 (11-3850)).  GCIA is a county agency of the County of Gloucester, New Jersey, with a place of business in Woodbury, New Jersey, alleged to be overseeing the development of the future Port of Paulsboro, New Jersey.  (*Complaint*, D.E. 1 ¶ 4, 13 (11-4338)).

---

[1] Given the similarity of facts and law among the respective cases, the fact that Weeks Marine and GCIA have submitted mirror arguments in support of their motions to dismiss, and in the interest of judicial economy, this opinion applies to the following civil actions: *Weeks Marine, Inc. v. TDM America, LLC* and *TDM America, LLC, and UTEX Holdings, LLC v. Weeks Marine, Inc.*, D.N.J. Civil Action No. 11-3850, and *TDM America, LLC and UTEX Holdings, LLC v. Gloucester County Improvement Authority*, D.N.J. Civil Action No. 11-4338.  For ease of reference, the Court refers to Weeks Marine and GCIA collectively as "Defendants."   Arguments attributed to Defendants are attributed to both Weeks Marine and GCIA unless otherwise noted.

GCIA is an agent for South Jersey Port Corporation ("SJPC"), and GCIA has a contract with Weeks Marine pursuant to which Weeks Marine will perform dredging work.  (OA Tr. at 48:24-49:3).

On July 5, 2011, Weeks Marine sued TDM for declaratory judgment of non-infringement and invalidity relating to the '731 patent and U.S. Patent No. 5,931,605 ("the '605 patent" or " '605").  (*Complaint*, D.E. 1 (11-3850)).[2]  On July 27, 2011, TDM filed a complaint alleging patent infringement against GCIA and SJPC, instituting a parallel proceeding.[3]  (*Complaint*, D.E. 1 (11-4338)).  On August 10, 2011, TDM filed its initial answer and counterclaims.  (D.E. 13 (11-3850)).[4]  On August 19, 2011, TDM filed an answer with amended counterclaims, indicating that UTEX was an exclusive licensee of TDM and a counterclaim-plaintiff.  (D.E. 30 (11-3850)).

TDM alleges that it "is the owner, by assignment, of all right, title and interest in the '731 patent," and that UTEX "is the worldwide exclusive licensee of the '731 patent, as well as other patents, trade secrets and know-how, related to the treatment and processing of waste materials including dredged materials."  (*Answer and Amended Counterclaims*, D.E. 30 at 7, ¶¶ 8, 9 (11-3850)).  On September 6, 2011, Weeks Marine and GCIA filed motions to dismiss Plaintiffs' amended counterclaims alleging infringement of the '731 patent.  Both motions allege breaks in the chain of title.  In their motions, Defendants argue that breaks in the chain of title exist between the inventor and Plaintiffs, and therefore Plaintiffs do not have good title to the patent.

---

[2] On August 9, 2011, TDM filed a motion to dismiss all counts and causes of action directed to the '605 patent in Weeks Marine's Declaratory judgment complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (D.E. 7 (11-3850)).  On October 5, 2011, the parties entered into a stipulation of dismissal regarding the '605 patent, (D.E. 61 (11-3850), mooting the motion.  On the same date, the Court so ordered the Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).  (D.E. 66 (11-3850)).

[3] On August 18, 2011 TDM voluntarily dismissed SJPC from the suit, (D.E. 11 (11-4338)), and filed an Amended Complaint, adding UTEX as a co-plaintiff.  (D.E. 12 (D.N.J. 11-4338)).

[4] On the same day, August 10, 2011, TDM and UTEX moved for a Temporary Restraining Order and Preliminary Injunction.  (D.E. 14 (D.N.J. 11-3850)).  The Court denied the Temporary Restraining Order following oral argument.  (D.E. 15 (D.N.J. 11-3850)).  The motion for preliminary injunction is pending before the Court, and oral argument is scheduled for November 29-30, 2011.

As such, Defendants argue, Plaintiffs do not have standing to sue, the Court lacks jurisdiction, and the Court should therefore dismiss under Fed. R. Civ. P. 12(b)(1).

### B.      Chain of Title

On May 15, 1997, inventor Ritchie G. Studer ("Studer") submitted Provisional Application No. 60/046,616 (the " '616 provisional application") for "In Situ Stabilization of Dredged Materials" with the United States Patent and Trademark Office ("USPTO"). (Declaration of Rick Redle in Support of Pl. Opp. Br., the "Redle Decl." Ex. 3).[5] Subsequently, Studer transferred a 50% interest to ECDC Environmental, L.C. ("EDCD Environmental") and a 50% interest to Investment Resource Management, L.P. d/b/a ITEX, Division of IRM, L.P. ("ITEX").  Both ECDC Environmental and ITEX then transferred their 50% interests to ECDC East LC ("ECDC East"), which changed its name to SK Services (East), L.C. ("SK Services"), before transferring its 100% interest in the now-issued '731 patent to IMEX Partners, L.P. ("IMEX").  Finally, IMEX transferred its interest in the '731 patent to TDM, who licensed its interest to UTEX.

Plaintiffs TDM and UTEX rely on the following documents to support their chain of title theory: (1) Inventor Ritchie G. Studer's <u>May 19, 1997</u> assignment of 50% of the right, title, and interest in the '616 provisional application to EDCD Environmental and 50% interest to ITEX (Redle Decl. Ex. 4); (2) ECDC Environmental's <u>November 25, 1997</u> assignment of its 50% interest in the '616 provisional application to ECDC East (*id.* Ex. 5); (3) ITEX's <u>May 15, 1998</u> assignment of its 50% interest in the '616 provisional application to ECDC East (*id.* Ex. 9); (4) ECDC East's <u>June 25, 1998</u> Amendment to the Articles of Organization for Limited Liability Company changing its name to SK Services (*id.* Ex. 10); (5) SK Services' <u>June 24, 2002</u> assignment of the '731 patent to IMEX (*id.* Ex. 13); (6) IMEX's <u>March 23, 2005</u> assignment of

---

[5] The '616 provisional application ripened into the '731 patent on September 25, 2001.  For purposes of its chain of title analysis, the Court draws no distinction between the assignment of rights in the provisional application and rights in the patent itself.

the '731 patent to TDM (*id.* Ex 14); and (7) TDM's <u>May 5, 2005</u> Second Amendment to the Exclusive Patent License Agreement with UTEX regarding the '731 patent.  (Declaration of Michael C. Walch in Support of Pl. Opp. Br., the "Walch Decl." Ex. 3).

### C.    Arguments

Generally, Defendants move to dismiss Plaintiffs' counterclaims for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1), alleging that Plaintiffs did not own the '731 patent at the time the counterclaims were filed, and that the TDM-UTEX license was insufficiently exclusive to confer standing to UTEX.

Specifically, Defendants argue that three breaks occurred in the chain.  First, Defendants challenge the authenticity of the November 25, 1997 assignment between ECDC Environmental and ECDC East, arguing this "threshold flaw taints all subsequent purported assignments, including the final alleged assignment to TDM."   (Def. Moving Br. at 3, 9).   Second, encumbrances stemming from SK Services' bankruptcy proceeding cloud the June 24, 2002 conveyance to IMEX.  (Def. Reply Br. at 3-5).  Third, Defendants allege two flaws in TDM's licensing of the '731 patent to UTEX.  Namely, "TDM attempted to exclusively license UTEX in June 2004, almost one year before TDM even allegedly received its assignment from IMEX Partners in March 2005."  (Def. Moving Br. at 4, 10).  Defendants also argue that the scope of the license is too narrow to give UTEX standing to join the suit.  (*Id.* at 9-10).

As to the first alleged break, Plaintiffs argue that the November 25, 1997 assignment from ECDC Environmental to ECDC East is authentic and establishes a valid link.  (Pl. Sur-Reply Br. at 5-6).  As to the second alleged break, Plaintiffs argue that the bankruptcy proceeding did not cloud SK Services' title, and therefore the '731 patent passed from SK Services to IMEX "free and clear of all encumbrances and liens."  (Pl. Opp. Br. at 10-11).  As to the third alleged break, Plaintiffs argue that TDM retained ownership of the '731 patent before

licensing it to UTEX, and that the license's scope was sufficiently exclusive to confer standing to UTEX.  (Pl. Opp. Br. at 11-12; Pl. Sur-Reply Br. at 9-12).

Additional facts and arguments relating to each link in the chain of title are discussed in Part III below, where the Court analyzes each link individually.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim.  A motion under 12(b)(1) "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction."  *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  Defendants style their motion as a factual challenge to the Court's subject matter jurisdiction.  In a factual attack, the moving party challenges the alleged jurisdictional facts, and the court may consider evidence outside the pleadings.  *Id.*  Additionally, "conflicting written and oral evidence may be considered and a court may decide for itself the factual issues which determine jurisdiction."  *Koronthaly v. L'Oreal USA, Inc.*, No. 07-5588, 2008 WL 2938045, at *2 (D.N.J. July 29, 2008) (citations omitted).  Once subject matter jurisdiction is challenged under 12(b)(1), the plaintiff bears the burden of persuasion.  *Symczy v. Genesis Healthcare Corp.*, No. 10-3178, 2011 WL 3835404, at *2 n.4 (3d Cir. 2011) (citations omitted); *U.S. ex rel. Feldstein v. Organon, Inc.*, No. 07-2690, 2009 WL 961267, at *4 (D.N.J. Apr. 7, 2009) ("Once a Fed. R. Civ. P. 12(b)(1) challenge is raised, the burden shifts and the plaintiff must demonstrate the existence of subject matter jurisdiction.").

### B.    Standing: Patent Assignments and Chain of Title Analysis

Standing is a constitutional requirement pursuant to Article III, and a threshold jurisdictional issue.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit.  *Keene Corp. v.*

*United States*, 508 U.S. 200, 207 (1993).[6]  To assert standing "in a patent infringement action, 'the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit.' "  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (quoting *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309-10 (Fed. Cir. 2003)); *see also Church & Dwight Co., Inc. v. Abbott Labs.*, No. 05-2142, 2006 WL 3000201, at *5 (D.N.J. Oct. 20, 2006) (evaluating standing of counterclaim-plaintiff as of the date the party filed counterclaims).

"Standing to sue for infringement stems from the Patent Act, which provides: '[a] patentee shall have remedy by civil action for infringement of his patent.' 35 U.S.C. § 281." *Israel Bio-Eng'g Project v. Amgen Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007).  The term "patentee" in § 281 of the Patent Act can refer to the original owner or "successors in title to the patentee." *Id.* (quoting 35 U.S.C. § 100(d)).  Thus, in order to survive Defendants' motion, TDM and UTEX must establish by a preponderance of the evidence that they held title to the patent on the day that they commenced the counterclaims.[7]  To establish whether TDM and UTEX held title to the '731 patent, the Court must "trace the chain of title" linking the named inventors to TDM and UTEX.  *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092 (Fed. Cir. 1998). The Federal Circuit has interpreted § 261, the ownership and assignment provision of Title 35 of the United States Code, as providing:

> [A]pplications for patent, patents, or any interest therein are assignable by an instrument in writing.  The patent statutes allow the instrument that assigns any interest to take the form of a patent license or any other written instrument that transfers patent rights.  The type of written instrument (*e.g.*, license or assignment

---

[6] If a plaintiff lacks standing to sue on the date it files suit, then such a deficiency cannot be cured retroactively. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (citing *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005)).

[7] TDM filed its Answer and Counterclaims on August 10, 2011.  (D.E. 13 (D.N.J. 11-3850)).  TDM filed its Answer and Amended Counterclaims on August 19, 2011.  (D.E. 30 (D.N.J. 11-3850)).  With its present motion, Weeks Marine seeks dismissal of TDM's Amended Counterclaims, filed on August 19, 2011.  (Def. Moving Br. at 2).

agreement, dissolution agreement, or merger agreement) and the factual context in which the instrument is created is irrelevant . . . .

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 n.3 (Fed. Cir. 2007) (quotations omitted). Section 261 does not require that the writing be recorded in the USPTO.  *See Gaia Techs. v. Reconversion Techs.*, 93 F.3d 774, 777 (Fed. Cir. 1996) ("[T]he recording of an assignment is necessary only to protect the assignee from subsequent bona fide purchasers without notice."), *as amended on reh'g on different grounds*, 104 F.3d 1296 (Fed. Cir. 1996).  Therefore, whether a Plaintiff that is an apparent "successor in title" has standing to sue depends on the substance and scope of any purported assignment or transfer documents that are part of the alleged chain.

## C.    Standing: Patent Licenses

The Patent Act does not limit the right to sue to only patent owners and assignees.  The Federal Circuit has explained that "[b]ecause the legally protected interests in a patent are the exclusionary rights created by the Patent Act, a party holding one or more of those exclusionary rights—such as an exclusive licensee—suffers a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore has standing to sue."  *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264-65 (Fed. Cir. 2011).  By contrast, a " 'bare licensee' holds nothing more than a promise from the patentee that the patentee will not sue the licensee for practicing the patented invention," and therefore generally has no standing to bring or join a patent infringement action.  *Id.* (citing *Ortho Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995)).

"A licensee is an exclusive licensee of a patent if it holds *any* of the exclusionary rights that accompany a patent."  *Id.* at 1266-67 (emphasis added) (explaining that a licensee can still be "exclusive" even if it is not the only party with the ability to license the patent).  Thus, the touchstone for standing is whether the purportedly exclusive licensee "has shown that it has the

right under the patents to exclude *the Defendants* from engaging *in the alleged infringing activity* and therefore is injured by the Defendants' conduct." *Id.* at 1267 (emphasis added).

With these standards in mind, the Court analyzes each link in the purported chain of title alleged by Plaintiffs as well as each challenge by Defendants, finding in Part III of this opinion that <u>TDM has standing</u> to sue, and in Part IV that <u>UTEX has standing</u> to sue.

## III.   DISCUSSION: TDM'S STANDING

### A.      May 19, 1997: Assignment from Studer to ECDC Environmental and ITEX

On May 15, 1997, inventor Studer submitted the '616 provisional application for "In Situ Stabilization of Dredged Materials" to the USPTO.  (Redle Decl. Ex. 3).  On May 19, 1997, Studer assigned 50% of his "right, title and interest in . . . [the '616] application" to ECDC Environmental and 50% interest to ITEX.  (*Id.* Ex. 4, at 1, 5).  Defendants do not challenge this link, (OA Tr. at 5:23), and the Court finds that the May 19, 1997 assignments from Studer to ECDC Environmental and ITEX met the writing requirement of § 261.   Therefore, ECDC Environmental and ITEX each had the power to assign a 50% interest in the '616 application as of May 19, 1997.

### B.      November 25, 1997: Assignment from ECDC Environmental to ECDC East

On November 25, 1997, ECDC Environmental assigned its 50% interest in the '616 provisional application to ECDC East.  (Redle Decl. Ex. 5; Declaration of Kent Loest in Sur-Reply, the "Loest Decl." Ex. 1, the "November 25, 1997 assignment" ("We do sell, assign, and transfer and by these presents do sell, assign and unto ECDC, the full and exclusive right, title and interest in and to any and all patents which may be granted therefor . . . .")).  Defendants advance two main challenges to the assigning document's authenticity and reliability, arguing that Plaintiffs have failed to prove the assignment by a preponderance of the evidence.  The Court addresses these two challenges separately.

### 1.      Challenge 1: Lack of Recordation and Notarization

Defendants challenge the assignment on the grounds that it was not recorded in the USPTO or notarized, and therefore was not authentic or reliable enough to meet TDM's and UTEX's burden to persuade the Court by a preponderance that it has subject matter jurisdiction. (Def. Reply Br. at 5-7).  Defendants add that "every other link in the chain of title, including the bankruptcy-related assignment, is reflected in the PTO records," and "all but one of the four assignments recorded with the PTO was notarized."  Therefore, the document fails to provide *prima facie* evidence of a valid assignment.  (*Id.* at 6).  In response, Plaintiffs argue that recordation and notarization are not requirements for a valid assignment and that multiple parties have attested to the assigning document's authenticity, thereby providing *prima facie* evidence of a valid assignment and satisfying Plaintiffs' burden.  (Pl. Sur-Reply Br. at 4-6).

The Court finds that Plaintiffs have the better of this argument.  Recordation in the USPTO and notarization are not *per se* requirements for purposes of giving legal effect to an assignment of patent rights.  *See* 35 U.S.C. § 261 ("An assignment, grant or conveyance shall be void *as against any subsequent purchaser or mortgagee* for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.") (emphasis added); *Gaia Techs*, 93 F.3d at 777 ("[T]he recording of an assignment is necessary *only to protect the assignee from subsequent bona fide purchasers* without notice.") (emphasis added).[8]  Although recordation is a requirement for raising a bona fide purchaser defense, it is not a precondition for a valid assignment under § 261.  By citing *Krausz Industries v. Romac Industries*, Defendants make clear that they recognize this distinction.  No. 10-1204, 2011 U.S. Dist. LEXIS 90653, at *5-6

---

[8] Weeks Marine is not—and does not argue that it is—a bona fide purchaser of provisional application '616 or the eventual '731 patent; therefore, the recordation provision of § 261 is not at issue.

(W.D. Wash. Aug. 15, 2011) ("[N]otarization and recordation are not preconditions for a valid assignment.").

Defendants' observations that "every other link in the chain of title . . . is reflected in the PTO records," and "all but one of the four assignments recorded with the PTO was notarized" are unpersuasive. (Def. Reply Br. at 5-7). The fact that other assignments were notarized and recorded means that those links in the chain were presumptively valid, but does not mean that the November 25, 1997 assignment was invalid. Although recordation is *prima facie* evidence of validity under § 261, the lack of recordation or notarization does not create a presumption of invalidity. Lack of recordation simply means that the document's authenticity should be established by alternative means, as it is here in two declarations supporting Plaintiffs' opposition and sur-reply briefs.

First, Plaintiffs have submitted the declaration of William B. Chaney, who maintained the '731 patent file when IMEX purchased the patent from SK Services on June 24, 2002 (discussed below). Mr. Chaney declares: "Attached . . . to this Declaration are true and correct copies of the following documents . . . [including the] November 25, 1997 [assignment], of patent application[] 60/046,616 . . . from ECDC Environmental, L.C. to ECDC East, L.C. (the 'ECDC '731 Patent Application Assignments')." (Declaration of William B. Chaney in Support of Pl. Opp. Br., the "Chaney Decl." ¶ 7(g)). Second, Plaintiffs have submitted the declaration of Kent Loest who declares that he has "personal knowledge of the statements made herein," and that he "signed assignments conveying ECDC Environmental's 50% interest in provisional patent application no[]. 60/046,616 . . . to ECDC East, L.C. on November 25, 1997, true and accurate copies of which are attached as Exhibit 1." (Loest Decl. ¶¶ 1-3).[9]

---

[9] Subsumed within their arguments about recordation and notarization, (OA Tr. at 7:25-8:1), are Defendants' arguments under F.R.E. 1002. Defendants argue that copies of the November 25, 1997 assignment attached to the Redle, Chaney, and Loest declarations are inauthentic and unreliable because they are photocopies, and F.R.E. 1002 requires an original. (Def. Reply Br. at 6-7 (citing F.R.E. 1002, which provides that "[t]o prove the content of a

Taken together, declarations under penalty of perjury from people who have worked closely with the '731 patent—namely, Mr. Loest, who executed the November 25, 1997 document, and Mr. Chaney, who maintained the '731 patent file in a subsequent purchase—persuade the Court that the document is authentic despite its lack of recordation and notarization.

### 2.    Challenge 2:  Lack of ECDC East's Countersignature

Next, Defendants challenge the authenticity and reliability of the November 25, 1997 assignment on the grounds that ECDC Environmental, the assignor, was the only party to execute the assignment, and that ECDC East, the assignee, did not countersign.  Specifically, Defendants argue that the document features only one signature line, executed by Kent Loest / Vice President / ECDC Environmental, L.C., and the lack of a countersignature by the assignee renders the document inauthentic.  An examination of the face of the document itself, in addition to the corporate context in which the November 25, 1997 assignment occurred, persuades the Court to reject Defendants' argument.

First, the document appears to be authentic and reliable on its face because the signature block contains only one line for a signature, which is executed by Mr. Loest.  No additional signature lines exist, so it cannot be said that there is a conspicuous blank on which another signature should appear.  This is consistent with the *granting* nature of the document itself.  If only the assignee's signature appeared on the line, the Court would have greater cause for concern.  Second, ECDC Environmental and ECDC East were subsidiaries of the same corporate

---

writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules").  In support of their arguments, Defendants cite *Crespo v. Unisys Corp.*, in which the court inferred, in dicta, at the summary judgment stage, that affidavits would not have saved evidence from being barred by the best evidence rule had they been submitted to prove the contents of a writing.  No. 94-2339, 1996 U.S. Dist. LEXIS 20956, at *28 (D.N.J. Jun. 21, 1996).  Under *Crespo*, Defendants argue that copies of the November 25, 1997 assignment attached to declarations should be discounted.  Plaintiffs counter that the "original in possession of opponent" exception applies, F.R.E. 1004(3), and that "an original is not required because testimony exists that such an assignment occurred."  (Pl. Sur-Reply Br. at 6).  As to these arguments, the Court notes only that it is sufficiently persuaded that Plaintiffs have met their burden for purposes of Defendants' motion to dismiss.  The Court further notes that if, at a later stage in the litigation, evidence arises contradicting the authenticity or reliability of the November 25, 1997 assignment, the Court reserves its right to revisit the issue of jurisdiction *sua sponte*.

parent, Laidlaw Inc.  (Pl. Opp. Br. at 2).  The transfer occurred between two related entities just before the parent Laidlaw sold one subsidiary, assignor ECDC Environmental, and continued its landfill business through another subsidiary, assignee ECDC East.  In fact, Kent Loest, who executed the assignment on behalf of ECDC Environmental, began to work for ECDC East after the sale of ECDC Environmental.  (Loest Decl. ¶¶ 2-3).  Because Mr. Loest transferred the patent application from the subsidiary for which he worked to the subsidiary for which he would work in the future, and because both were subsidiaries of the same parent, the lack of a countersignature is less conspicuous, and the Court finds the November 25, 1997 assignment to be authentic and reliable.

Having rejected Defendants' challenges to the authenticity and reliability of the November 25, 1997 assignment, and having found that ECDC Environmental "s[old], assign[ed], and transfer[red] . . . unto ECDC [East], the full and exclusive right, title and interest in and to any and all patents which may be granted therefor," the Court finds that the assignment from ECDC Environmental to ECDC East met the writing requirement of § 261.

### C.  May 15, 1998: Assignment from ITEX to ECDC East

On May 15, 1998, ITEX assigned its 50% interest in the '616 provisional application to ECDC East.  (Redle Decl. Ex. 9).  The parties do not dispute the authenticity of this assignment, (OA Tr. at 12:6-12), which, notably, contains nearly identical language and an identical signature block to the November 25, 1997 assignment discussed above.[10]  The Court finds that the assignment met the writing requirement of § 261, and that ECDC East therefore had the power to assign its 100% interest in the '616 provisional application as of May 15, 1998.

---

[10] During oral argument Plaintiff explained that the same counsel had likely prepared the November 25, 1997 and the May 15, 1998 assignments, lending further credence to the authenticity and reliability of the November 25, 1997 assignment despite its lack of countersignature.  (OA Tr. at 9:14-22, 10: 3-12).

### D.   June 25, 1998: Name Change from ECDC East to SK Services

On June 25, 1998, Secretary Henry H. Taylor executed the State of Utah Amendment to Articles of Organization for Limited Liability Company, changing the name of ECDC East to SK Services (East), L.C.  (Redle Decl. Ex. 10).  On July 6, 1999, Secretary (and Sole Member) Taylor executed the State of Utah Certificate of Amendment of the Articles of Organization of SK Services (East), L.C., making SK Services East a wholly-owned subsidiary of Safety-Kleen Corp.  (Redle Decl. ¶ 18, Ex. 11).  The parties do not dispute this name change.  (OA Tr. at 12:6-12).  ECDC East had the power to assign its 100% interest in the '616 provisional application as of June 25, 1998.

### E.   The Safety-Kleen Bankruptcy

On June 9, 2000, Safety-Kleen and its subsidiaries and affiliates, including SK Services filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.[11]  As part of the bankruptcy proceeding, IMEX purchased the '731 patent from SK Services.  (Chaney Decl. ¶ 6).[12]  On June 13, 2002, the United States Bankruptcy Court for the District of Delaware issued an order "authorizing and approving [the] sale of U.S. Patent No. 6,293,731 free and clear of liens, claims, interests, and encumbrances" from Safety-Kleen to IMEX, who had submitted the highest and best offer at auction.  (Id. Ex. E at 1, 3).  The Bankruptcy Court's order did, however, recognize three "claims" against the '731 patent, (id. Ex. E at 27), which Defendants argue clouded the title and broke the link in the chain from SK Services to IMEX.  Specifically,

---

[11] Previously, on April 3, 1997, ITEX (which subsequently became IMEX) and ECDC Environmental entered into a joint venture agreement under which ITEX agreed to provide services to ECDC Environmental for purposes of meeting obligations under contracts to dispose of dredging materials.  (Redle Decl. ¶¶ 7-9, Ex. 1).  ECDC Environmental's obligations became the obligations of ECDC East and then SK Services, who eventually defaulted on payments owed to ITEX (now IMEX) pursuant to the April 3, 1997 agreement.  (Redle Decl. ¶ 19; Chaney Decl. ¶ 5).  On June 9, 2000, Safety-Kleen filed for bankruptcy, and the proceedings were jointly administered under the caption, *In re: Safety-Kleen Corp., et al*, No. 00-2303.

[12] The '731 patent issued on September 25, 2001.  (Redle Decl. Ex. 12 at 1).  On June 13, 2002, the same day as the bankruptcy proceedings, SK Services transferred the '731 patent to IMEX via an Asset Purchase Agreement. (Attached as Ex. A to Chaney Decl. Ex. E).

Defendants argue, first, that an equitable lien by Creamer Investments, Inc. ("Creamer Investments") clouded the assignment of title, and second, that licenses alleged by Creamer Investments and Metals Management, Inc. ("Metals Management") clouded the assignment of title in a manner that broke the chain.  (Def. Reply Br. at 3-5).[13]  Plaintiffs counter that the two objections "recognized by the Delaware Bankruptcy Court . . . were either resolved at the time or never adjudged valid, and, in any event, do not impact ownership of the patent for standing purposes."  (Pl. Sur-Reply Br. at 7).

The Court agrees with Plaintiffs for three reasons.  First, Defendants do not cite—and the Court is not aware of—binding authority stating that an equitable lien would impact ownership in a manner that prevents the assignment of a patent for standing purposes.[14]

Second, even if the Court were bound by such authority, Plaintiffs have persuaded the Court by a preponderance that the alleged equitable lien would have been satisfied.[15]  At the June

---

[13] The purported "competing 'claims' related to [SK Services'] ownership and exploitation of the Patent" are:

> (1) One entity asserts that it has a nonexclusive, nontransferable, royalty free, perpetual license to use the Patent throughout all the world, except North America;

> (2) This entity also alleges that it has an equitable lien on the Patent; and

> (3) A second entity has claimed a right and license to use certain equipment previously purchased from SK Services (East), L.C. for purposes of treating and processing dredge materials in the manner disclosed and claimed in the Patent.

(Chaney Decl. Ex. E at 27, Letter from Lee W. Zimmerman, Senior Corporate Counsel for Safety-Kleen Corp., to J. Arnold Witte, President Donjon Marine Co., Inc., Feb. 18, 2002, "the February 18, 2002 letter").

[14] In fact, Defendants do not cite any authority at all to support this proposition.  At oral argument, Defendants admitted that "[t]here would be nothing specifically that we would point to" in the law that says a lien would prohibit the assignment of the '731 patent.  (OA Tr. at 20:12-19).

[15] The Court clarifies that it *does not* make any findings with respect to entities or issues not presently before it.  Specifically, the Court makes no findings with respect to whether Creamer Investments *actually* has an equitable lien or whether Creamer Investments or Metals Management *actually* have enforceable licenses.  Instead, the Court finds only that—for purposes of this motion to dismiss under Fed. R. Civ. P. 12(b)(1), and evaluating only the materials submitted in connection with the motion—the bankruptcy materials are insufficient to show a break in the chain of title.

13, 2002 omnibus bankruptcy hearing, Creamer Investments agreed that the lien would attach to the proceeds of the sale of the '731 patent and not to ownership of the patent itself.[16]

Third, the Court finds that the two alleged licenses by Creamer Investments and Metals Management—even if they were proven to exist—would not create breaks in the chain of title. Generally, licenses do not create exclusionary ownership interests in patents sufficient to constitute virtual assignments of title, and assignments of title are the focus of chain of title analysis. *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1321 (Fed. Cir. 2009) ("[Licensor's] agreement with [licensee] did not convey all substantial rights under the patents and thus did not make the license tantamount to an assignment."); *Ortho Pharm. Corp.*, 52 F.3d at 1031 ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly. . . . He has no property interest in the monopoly of the patent, nor any contract with the patent owner that others shall not practice the invention.") (citations omitted).

As set forth in the February 18, 2002 letter on which Defendants base their arguments, neither purported license would be exclusive. Claim 1—"One entity asserts that it has a *nonexclusive*, nontransferable, royalty free, perpetual license to use the Patent throughout all the world, except North America"—would be nonexclusive by its own terms. (Chaney Decl. Ex. E at 27) (emphasis added). Claim 3—"A second entity has claimed a right and license to use certain *equipment* previously purchased from SK Services (East), L.C. for purposes of treating and processing dredge materials in the manner disclosed and claimed in the Patent" —would relate only to equipment, and the '731 patent protects a method. (*Id.*) (emphasis added).

---

[16] At the bankruptcy hearing, the court asked whether—to the extent Creamer Investments actually had a valid equitable lien—the parties would be "willing to allow the alleged equitable lien to attach to the proceeds and put the proceeds in an escrow account until that equitable lien is determined?" Counsel for Creamer Investments agreed, stating, "We would be, Your Honor." The court stated, "Well, Mr. Hickman [counsel for Creamer Investments], that addresses your issue, doesn't it?" Mr. Hickman replied, "Yes, sir, it does." (Chaney Decl. Ex. D at 10).

16

Thus, the Court is persuaded by a preponderance that SK Services had the power to assign the '731 patent to IMEX despite the circumstances surrounding the bankruptcy.

### F.     June 24, 2002: Assignment from SK Services to IMEX

On June 24, 2002, SK Services assigned its "entire right, title and interest" in the '731 patent to IMEX.  (Redle Decl. Ex 13).  Defendants do not challenge the assignment itself.  Rather, they argue that the bankruptcy created a break in the chain of title.  Incorporating its analysis from above, the Court rejects Defendants' argument, finding that the assignment met the writing requirement of § 261, and therefore IMEX had the power to assign the '731 patent as of June 24, 2002.

### G.     March 23, 2005: Assignment from IMEX to TDM

On March 23, 2005, IMEX assigned "its entire right, title, and interest in" the '731 patent to TDM.  (Redle Decl. Ex 14).  Defendants do not challenge this assignment, (OA Tr. at 27: 1-7), and the Court finds that the assignment met the writing requirement of § 261.  TDM therefore had the power to assign and license the '731 patent on March 23, 2005.

Having traced the chain of title from the inventor to TDM, and having found that Plaintiffs successfully demonstrated by a preponderance of the evidence that no breaks in the chain exist, the Court finds that TDM has standing.

## IV.     DISCUSSION: UTEX'S STANDING

At issue is, first, whether TDM had the power to license the '731 patent at the time it provided a license to UTEX, and second, whether the scope of the license was sufficiently exclusive to confer standing to UTEX.  The Court finds that TDM did have the power to license the '731 patent and that its license to UTEX was sufficiently exclusive to confer standing.

**A.      TDM's Power to License the '731 Patent**

Plaintiffs and Defendants offer different theories as to whether TDM had the power to license the '731 patent to UTEX.  Defendants argue that "the TDM-UTEX license is void *ab initio* . . . [because] TDM attempted to exclusively license UTEX in June 2004, almost one year before TDM even allegedly received its assignment from IMEX Partners in March 2005."  (Def. Moving Br. at 10).  In support, Defendants cite TDM's June 15, 2004 Exclusive Patent License Agreement with UTEX.  (Declaration of Thomas J. Bean in Support of Def. Moving Br., the "Bean Decl." Ex. 5).  Attached to the agreement as Exhibit A is a list of patents that *included* the '731 patent.  If accepted as the true and correct version of Exhibit A, the document would show that TDM licensed the '731 patent to UTEX *before* it had the power to do so.

Plaintiffs offer a different theory.  Plaintiffs argue that on June 15, 2004, TDM and UTEX entered into an "Exclusive Patent License Agreement," granting to UTEX "a worldwide, exclusive, non-transferable, and non-sublicensable . . . license to the Licensed Technology in the Field of Use."  (Walch Decl. Ex. 1 at 2).  Plaintiffs further explain that subsequently—on May 5, 2005, *after* TDM had already been assigned the patent on March 23, 2005—TDM and UTEX amended their Exclusive Patent License Agreement to add the '731 patent.  (Walch Decl. Ex 3 at 9, the "Second Amendment").  In support, Plaintiffs rely on a different—and, according to Plaintiffs, the correct—version of Exhibit A.  This version, the one submitted with the Walch Declaration as Exhibit 1, *did not* list '731 as one of the patents being licensed to UTEX, and therefore, Plaintiffs argue, TDM was not licensing the patent before it had been assigned.  (*Id.*).

The question therefore becomes which Exhibit A is the correct one.  Plaintiffs argue that the version of Exhibit A on which the Defendants focus was submitted in error, "by [Mr. Redle] who is not an attorney, who is trying to put together a lot of deals for UTEX . . . [who] took the

18

wrong exhibit, and attached it to the . . . agreement[]."  (OA Tr. at 32:11-25; *see also* Pl. Sur-Reply Br. at 10-11).

Although the Court shares the Defendants' concern that Plaintiffs initially submitted an inaccurate version of Exhibit A, Plaintiff's subsequent submissions have persuaded the Court by a preponderance that the correct version of Exhibit A is the version submitted with the Walch Declaration that does not include the '731 patent, thereby showing that TDM licensed the '731 patent to UTEX *after* TDM had received title from IMEX.  First, Mr. Walch—an attorney who has represented UTEX and TDM in numerous corporate, tax, and patent matters, and the attorney who "prepared [the] Exclusive Patent License Agreement . . . whereby TDM granted an exclusive license for the use of all of the patents it owned at the time to UTEX"—declares that the version of Exhibit A *excluding* the '731 patent is the "true and correct copy of the June 2004 Exclusive Patent License Agreement."  (Walch Decl. ¶¶ 3-4).  Additionally, Mr. Walch declares that "[t]he second amendment was entered into on May 5, 2005, adding U.S. Patent No. 6,293,731," and that "[a] true and correct copy of the second amendment" is attached.  (*Id.* ¶ 6).

Second, at oral argument, Plaintiffs explained the "human error" that led to the initial submission of the incorrect version of Exhibit A.  (OA Tr. at 32:19).  Plaintiffs explained that Mr. Redle was "trying to put together a lot of deals for UTEX in compliance with their agreements with several parties to process and to dispose of dredge material," (*id.* at 32:20-25), and therefore "Mr. Redle made a mistake because he put the wrong exhibit with the wrong agreement."  (*Id.* at 31: 24-25).  Plaintiffs also explained that "[t]he originals were all retained by Mr. Walch, not by Mr. Redle," and therefore, Plaintiffs' counsel "endeavored to have the attorney that actually maintains all of this to say these are the agreements.  There is no deception here.  I prepared them.  I maintained them.  And this is their date and chronological order."

Accordingly, Plaintiffs submitted the declaration of that attorney, Mr. Walch, which the Court finds persuasive.

The Court concludes that TDM licensed the '731 patent to UTEX on May 5, 2005, *after* it had obtained title from IMEX.  Thus, TDM had the power to license the patent at the time it conveyed a license to UTEX.

### B.      Scope of the TDM-UTEX License

Finally, Defendants argue that the scope of the language in the Second Amendment—the May 5, 2005 document licensing the '731 patent from TDM to UTEX—is insufficiently exclusive to confer standing to UTEX.  (Def. Moving Br. at 9-10).  Defendants rely on the Federal Circuit's statement in *Enzo* to argue that "[a]ny less than a complete transfer of these rights is merely a license, in which case the title remains with the owner of the patent and the suit must be brought in its name."   134 F.3d at 1093.  Defendants also cite *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, for the proposition that to have standing, a licensee must hold "all substantial rights in the patent."  240 F.3d 1016, 1017 (Fed. Cir. 2001).  (Def. Moving Br. at 8).  Defendants further argue that the language of the Second Amendment does not confer "all substantial rights in the patent," and therefore UTEX is not an exclusive licensee and lacks standing.  In contrast, Plaintiffs argue that the Second Amendment is explicitly "exclusive," and provides that UTEX may "join any prosecution of alleged infringement or misappropriation of the Licensed Technology as may be applied under or affecting Licensee's business activities when such action is necessary to prevent third party unauthorized use of the Licensed Technology."  (Pl. Opp. Br. at 11-12 (quoting Second Amendment ¶ 5.1)).

The touchstone for whether a licensee is exclusive "is whether [the licensee] has shown that it has the right under the patents to exclude *the Defendants* from engaging in the alleged infringing activity and therefore is injured by the Defendants' conduct."   *WiAV*, 631 F.3d at

1267.   Under the *WiAV* analysis, therefore, the Court first identifies the "alleged infringing activity," and second, asks whether UTEX "has shown that it has the right under the patents to exclude" Weeks Marine and GCIA from the activity.   For purposes of determining whether UTEX is an exclusive licensee, the question is not whether UTEX can show that it has an exclusive hold on *every* right under the patent, but rather, whether UTEX can show that it has an exclusive hold on the rights allegedly infringed by the defendants.   *See id.* at 1266 ("A licensee is an exclusive licensee of a patent if it holds *any* of the exclusionary rights that accompany a patent.") (emphasis added).

As to the alleged infringing activity, the Court looks to the specific allegations set forth by the Plaintiffs, who clarified at oral argument that the "alleged infringing activity" is "to make, use, sell, the invention . . . [p]rotected by the '731 [patent].  If . . . Weeks Marine is doing that, that cognizable injury not only goes to TDM, but it also goes to UTEX."  (OA Tr. at 39:6-17). As to the whether UTEX has shown that it has the right to exclude Weeks Marine and GCIA from the alleged infringing activity, the Court analyzes the language of the licensing agreement:

> 2.1 License Grant.  Subject to the terms and provisions hereof, Licensor hereby grants to licensee a *worldwide, exclusive*, non-transferable, and non-sublicensable . . . license to the Licensed Technology in the Field of Use [*e.g.*, the treatment/processing of waste of soil like materials, including dredged materials]. The license granted shall not prohibit or limit, in any way, the ability of the Licensor or any Affiliate of Licensor *to make, have made, use, sell, or otherwise commercialize and/or exploit the Licensed Technology* [the '731 patent] *anywhere in the world*.  Nothing however contained herein shall prohibit Licensor for [sic] entering into License agreements with third parties if such licensing is for the benefit of UTEX Holdings or its affiliates subject to prior consent of UTEX Holdings, LLC.
>
> . . .
>
> 5.1 Control of Licensed Technology.  Licensor shall have the sole and exclusive right, in Licensor's absolute discretion, to exercise complete control over the Licensed Technology, including, but not limited to, the right to (i) prosecute any alleged infringement or misappropriation of the Licensed Technology . . . . *Notwithstanding the foregoing Licensee shall have the right to initiate (with the prior consent of Licensor) or join any prosecution of alleged infringement* or

21

misappropriation of the Licensed Technology as may be applied under or affecting Licensee's business activities when such action is necessary to prevent third party unauthorized use of the Licensed Technology.

(Second Amendment ¶ 2.1) (emphasis added).  Under ¶ 2.1, the exclusive grant to UTEX is for the making, using, selling, or otherwise commercializing or exploiting the '731 patent.  Under ¶ 5.1, UTEX has the right to exclude Weeks Marine and GCIA because it "shall have the right to initiate (with the prior consent of Licensor) or join any prosecution of alleged infringement." Here, UTEX has the right to exclude Weeks Marine and GCIA, the alleged infringers, because TDM has demonstrated its "prior consent" by adding UTEX to the action, obtaining the same counsel, and submitting the same briefs in connection with this motion.

The Court therefore finds that the TDM-UTEX license meets the test set forth in *WiAV* because the Second Amendment grants exclusivity with respect to the making, using, selling, commercializing, or otherwise exploiting the '731 patent, and UTEX has shown that it has the right to exclude alleged infringers Weeks Marine and GCIA.  The Court notes that it is questionable as to whether the Second Amendment grants an exclusive license as to all rights under the patent because UTEX "may not sublicense any of its rights" without "the consent of Licensor."  (Second Amendment ¶ 2.5).  However, *WiAV* makes clear that if UTEX has "any" of the exclusionary rights that accompany the patent—as it does here with respect to making, using, selling, commercializing or otherwise exploiting the '731 patent—UTEX is still an exclusive licensee.  *See WiAV*, 631 F.3d at 1266.

Thus, the Court finds that UTEX is an exclusive licensee for purposes of standing, and Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing is denied.

## V.    WEEKS MARINE'S MOTION TO STAY

Weeks Marine's argument to stay the case pending limited jurisdictional discovery—first made on reply in response to Plaintiff's invitation to the Court to dismiss Weeks Marine's

declaratory judgment action under Fed. R. Civ. P. 19 in the event that either Plaintiff was dismissed from the case for lack of standing—is denied as moot.  Weeks Marine argues, "if the court were not inclined to grant Weeks Marine's motion to dismiss TDM and UTEX's claims, staying the case while TDM sorted out the myriad encumbrances noted above would be judicious."  (Def. Reply Br. at 14).  Because the Court has found that none of the alleged encumbrances broke the chain of title and that TDM and UTEX both have standing, Weeks Marine's motion to stay is denied.

## VI.   GCIA'S MOTION TO STAY

GCIA moves to stay Civil Action No. 11-4338—initiated by TDM and UTEX against GCIA—under the "first to file" rule pending the outcome of Civil Action No. 11-3850 because "[t]he Weeks v. TDM matter will require an adjudication of the validity and alleged infringement of the '731 patent, which is a common issue in controversy in the second matter," and therefore "it makes sense from an efficiency standpoint to stay the second matter pending the outcome of the first matter."  (GCIA's Moving Br. at 13).  Plaintiffs argue that the first to file rule only applies where two actions are in two different district courts, and here, both cases are in the same court before the same judge.  The Court agrees.

The first to file rule enjoins the prosecution of similar cases in different federal districts because "in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."  *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941). The rule rests on the rationale that "[i]t is of obvious importance to all the litigants to have a single determination of their controversy, rather than several decisions which if they conflict *may require separate appeals to different circuit courts of appeals*."  *EEOC v. Univ. of Pa.*, 850 F.2d 969, 974 (3d Cir. 1988) (emphasis added) (quoting *Crosley*, 122 F.2d at 930).  Where the two cases are in different district courts and where appeals would go to different circuit courts, a

district court has " 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before *another* district court." *Id.* at 971 (emphasis added). The facts of the present actions fit neither the rule nor its rationale.

Both of these Civil Actions—Nos. 11-4338 and 11-3850—were filed in the United States District Court for the District of New Jersey. Indeed, both were assigned to the same district judge. Jurisdiction does not exist in two different district courts, and appeals in both actions would go to the United States Court of Appeals for the Third Circuit, and therefore the Court finds that the first to file rule does not apply.

Finally, GCIA argues that "[f]orcing the GCIA, as a public entity, and this Honorable Court to litigate the TDM v. GCIA Action under a cloud of uncertainty as to the ultimate validity of the '731 patent or the alleged infringement of the '731 patent by Weeks Marine wastes the GCIA's and this Court's resources." (GCIA's Reply Br. at 6). Although it is sensitive to the conservation of the parties' resources, the Court declines to stay Civil Action 11-4338 because it finds the first to file rule to be entirely inapplicable. Because the Court must endeavor to exercise its discretion to manage its docket in a manner that conserves the resources of both the parties and the Court, and because it finds that proceeding with both cases at the same time strikes the appropriate balance, the Court denies GCIA's motion to stay.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES Weeks Marine's and GCIA's motions to dismiss. (D.E. 45 (11-3850); D.E. 24 (11-4338)). Additionally, for the above reasons, the Court hereby DENIES Weeks Marine's and GCIA's motions to stay. (*Id.*). An appropriate order shall accompany this opinion.

s/Esther Salas
**Esther Salas, U.S.D.J.**

24